IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 23-1167

ZURICH AMERICAN INSURANCE COMPANY,
Plaintiff-Appellee

v.

MEDICAL PROPERTIES TRUST, INC.,
Defendant-Appellant

No. 23-1180

STEWARD HEALTH CARE SYSTEM, LLC,
Plaintiff-Appellant

v.

AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY
and ZURICH AMERICAN INSURANCE COMPANY,
Defendants-Appellees

On Appeal from an Order of the United States District Court
for the District of Massachusetts, Hon. Patti B. Saris

**COMBINED BRIEF OF APPELLEES ZURICH AMERICAN INSURANCE
COMPANY AND AMERICAN GUARANTEE AND LIABILITY
INSURANCE COMPANY**

Patrick F. Hofer (# 1199731)
Clyde & Co US LLP
1775 Pennsylvania Avenue, N.W., Suite 400
Washington, D.C. 20006
Tel: (202) 747-5110
patrick.hofer@clydeco.us

## <u>CORPORATE DISCLOSURE STATEMENT OF APPELLEE ZURICH AMERICAN INSURANCE COMPANY</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned counsel for Plaintiff-Appellee Zurich American Insurance Company provides the following Corporate Disclosure Statement:

Zurich American Insurance Company is a wholly owned subsidiary of Zurich Holding Company of America, Inc., a Delaware corporation. Zurich Holding Company of America, Inc. is wholly owned by Zurich Insurance Company Ltd, a Swiss corporation. Zurich Insurance Company Ltd is directly owned by Zurich Insurance Group Ltd, a Swiss corporation. Zurich Insurance Group Ltd is the only publicly traded parent company, with a listing on the Swiss stock exchange, and a further trading of American Depositary Receipts.

## <u>CORPORATE DISCLOSURE STATEMENT OF APPELLEE AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellee American Guarantee and Liability Insurance Company makes the following disclosures:

American Guarantee and Liability Insurance Company is a wholly owned subsidiary of Zurich American Insurance Company, a New York corporation. Zurich American Insurance Company is a wholly owned subsidiary of Zurich Holding Company of America, Inc., a Delaware corporation. Zurich Holding Company of America, Inc. is wholly owned by Zurich Insurance Company Ltd, a Swiss corporation. Zurich Insurance Company Ltd is directly owned by Zurich Insurance Group Ltd, a Swiss corporation. Zurich Insurance Group Ltd is the only publicly traded parent company, with a listing on the Swiss stock exchange, and a further trading of American Depositary Receipts.

# **TABLE OF CONTENTS**

I.  STATEMENT OF ISSUES PRESENTED ......................................................1

II.  STATEMENT OF THE CASE ...............................................................1

    A.  Factual Background.........................................................................2

        1.  The Zurich Policies ..................................................................2

        2.  The Norwood Hospital Roofing System.....................................3

        3.  The Flood Event........................................................................4

        4.  MPT's Insurance Claim ............................................................5

        5.  Steward's Insurance Claim .......................................................7

    B.  Procedural History.........................................................................7

    C.  The District Court's October 19, 2022 Order ................................8

III.  SUMMARY OF THE ARGUMENT..................................................11

IV.  STANDARD OF REVIEW .............................................................13

V.  ARGUMENT.....................................................................................13

    A.  This Court's Holding in *Nova* that "Surface Waters" in an All-Risks Insurance Policy Includes Pooled Rainwater on a Raised Parapet Roof Controls This Case ....................................................13

        1.  *Nova* Is Indistinguishable.........................................................13

        2.  *Nova's* Holding that the Term "Surface Waters" Includes Rainwater that Has Pooled on a Roof Is Dispositive...............16

        3.  This Panel Is Bound by *Nova* Under the "Law of the Circuit" Rule and Stare Decisis ..........................................................21

        4.  MPT's Attempt to Distinguish *Nova* By Recasting *Nova*'s Analysis as Applying Only to Grants of Coverage Is Unavailing.................................................................................22

5.  *Nova*'s Interpretation of "Surface Waters" Plainly Is Not Dictum ........................................................................25

    a)  Nova's Interpretation of "Surface Waters" Is Not Dictum ..........................................................26

    b)  Nova's "Surface Water" Analysis Is Carefully Considered ...............................................30

B.  Both *Nova* and the District Court Correctly Interpreted the SJC's Decisions in *Boazova* and *Surabian Realty* to Include Pooled Water on a Roof that Penetrates the Building from Above ...........................31

    1.  MPT Misreads *Boazova* as Requiring that Rainwater Must Be Located at "Ground Level" to Satisfy the SJC's Definition of "Surface Water" ....................................31

    2.  MPT's Argument that the Rainwater on the Parapet Roof Is Not "Surface Water" Because It Could Not "Naturally Spread" in a "Diffused State" Misunderstands the SJC's Decisions Holding that Water that Seeps Naturally Into a Building Is "Surface Water." ....................................37

C.  MPT's Proposed Interpretation Is at Odds with the Plain Language of the Policy ............................................40

    1.  The Only Relevant Authorities Have All Found the Definition of "Surface Water" Unambiguous ..........................40

    2.  Dictionary Definitions, Including Those Cited and Interpreted by the SJC, Strongly Favor Zurich's Interpretation that Exterior Artificial Surfaces Can Collect Surface Water Regardless of the Surface's Height ....................................42

    3.  MPT's Remaining Arguments Misunderstand the Flood Coverage's Requirements and Read in Requirements that Are at Odds with the Plain Language ..............................44

        a)  MPT's Argument that the Pooled Rainwater on the Roof Is "Rain" and Not "Surface Waters" Is Inconsistent with the Plain Meaning of the Policy and the Relevant Case Law ....................................44

iv

b)      The District Court Correctly Looked to the Definition of "Mudslide" to Support Its Interpretation of "Surface Waters" ..............................................................................49

c)      MPT's Argument that Construing Accumulation of Water on a Roof as "Surface Waters" Would Impact the Availability and Pricing of Flood Insurance Is Conjecture.......................................................................50

D.    The Court Should Not Certify Questions to the SJC ..........................51

VI.    CONCLUSION ...............................................................................51

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Arcam Pharm. Corp. v. Faria*,
    513 F.3d 1 (1st Cir. 2007)...................................................................27

*Boazova v. Safety Ins. Co.*,
    462 Mass. 346, 968 N.E.2d 385 (2012) .....................................*passim*

*Brandywine Smyrna, Inc. v. Millennium Builders, LLC*,
    2010 WL 1380252 (Del. Super. Ct. Apr. 8, 2010) .............................42

*Bringhurst v. O'Donnell*,
    124 A. 795 (Del. Ch. 1924) .................................................34, 37, 41

*Capital Mortg. Sols., LLC v. Cincinnati Ins. Co.*,
    __ F. Supp. 3d __, 2023 WL 3632705 (E.D. Mich. May 24, 2023)...................38

*City Fuel Corp. v. Nat'l Fire Ins. Co. of Hartford*,
    446 Mass. 638, 846 N.E.2d 775 (Mass. 2006) ...................................17

*Commonwealth v. United States*,
    333 U.S. 611 (1948)...........................................................................27

*Danville Comm'l Indus. Storage, LLC v. Selective Ins. Co.*,
    442 F. Supp. 3d 921 (W.D. Va. 2020)...........................................42, 49

*DeSanctis v. Lynn Water & Sewer Comm'n*,
    423 Mass. 112, 666 N.E.2d 1292 (1996)............................................34

*Dorchester Mut. Ins. Co. v. Krusell*,
    485 Mass. 431, 150 N.E.3d 731 (2020)...............................................40

*Easthampton Congregational Church v. Church Mut. Ins. Co.*,
    916 F.3d 86 (1st Cir. 2019)................................................................13

*Fidelity Coop. Bank v. Nova Cas. Co.*,
    726 F.3d 31 (1st Cir. 2013) .......................................................*passim*

*Foxworth v. St. Amand*,
    570 F.3d 414 (1st Cir. 2009)..............................................................51

*Martinez v. Am. Family Mut. Ins. Co.*,
    413 P.3d 201 (Colo. App. Ct. 2017) ...................................................................42

*McCoy v. Mass. Inst. of Tech.*,
    950 F.2d 13 (1st Cir. 1991) ..........................................................................30, 31

*In re Montreal Maine & Atl. Ry., Ltd.*,
    953 F.3d 29 (1st Cir. 2020) ..........................................................................30, 31

*Nathanson v. Wagner*,
    179 A. 466 (N.J. Ch. 1935) ...............................................................................42

*Nevor v. Moneypenny Holdings, LLC*,
    842 F.3d 113 (1st Cir. 2016) ..............................................................................21

*Oak Hill Inv. IV LLC v. State Farm Fire & Cas. Co.*,
    2017 WL 4286779 (N.D. Ohio Sept. 27, 2017), *aff'd,* 737 F. App'x
    722 (6th Cir. 2018) ............................................................................35, 36, 42

*San Juan Cable LLC v. Puerto Rico Tel. Co.*,
    612 F.3d 25 (1st Cir. 2010) ................................................................................21

*Sherwood Real Estate and Inv. Co. v. Old Colony Ins. Co.*,
    234 So. 2d 445 (La. Ct. App. 1970) ...................................................................34

*Smith v. Union Auto. Indem. Co.*,
    323 Ill. App. 3d 741, 752 N.E.2d 1261 (2001) ..................................................38

*State Farm Fire & Cas. Co. v. Paulson*,
    756 P.2d 764 (Wyo. 1988) .................................................................................46

*Suffolk Const. Co., Inc. v. Illinois Union Ins. Co*,
    80 Mass. App. Ct. 90, 951 N.E.2d 944 (2011) .................................................40

*Surabian Realty Co. v. NGM Ins. Co.*,
    462 Mass. 715, 971 N.E.2d 268 (2012) .................................................. *passim*

*Union Pac. R. Co. v. Mason City & Ft. D.R. Co.*,
    199 U.S. 160 (1905) ..........................................................................................27

*United States v. Cardales-Luna*,
    632 F.3d 731 (1st Cir. 2011) ..............................................................................21

*Valley Forge Ins. Co. v. Field*,
   670 F.3d 93 (1st Cir. 2012)...................................................................40

*Vicor Corp. v. Vigilant Ins. Co.*,
   674 F.3d 1 (1st Cir. 2012)...................................................................17

**Statutes**

28 U.S.C. § 1292(b) ...............................................................................8

**Other Authorities**

Charles A. Wright, *The Law of Federal Courts* § 58 (4th ed. 1983).......................30

Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*,
   81 N.Y.U. L. Rev. 1249, 1256 (2006) ................................................27

## I.    STATEMENT OF ISSUES PRESENTED

1.    Whether this case is controlled by the Court's decision in *Fidelity Co-operative Bank v. Nova Casualty Co.*, 726 F.3d 31 (1st Cir. 2013), which held under applicable Massachusetts law and based on indistinguishable facts and contract language that ponded water on the surface of a parapet roof that entered a building through the roof and damaged the building was "surface water" under the terms of an all-risk property insurance policy.

2.    Whether this Court should decline to certify issues to the Massachusetts Supreme Judicial Court given this Court's own clear precedent, in a decision that analyzed and followed Massachusetts law, which has not changed.

## II.    STATEMENT OF THE CASE

The central issue presented in these appeals—whether the term "surface waters" as used in the definition of "Flood" in a property insurance policy includes waters that accumulate on an artificial surface, such as a roof—has already been decided by this Court under controlling Massachusetts law, in a case that faithfully applied closely analogous precedent of the Supreme Judicial Court of Massachusetts.  The facts underlying the Court's prior decision on this issue are indistinguishable from the facts here, and, under the "law of the circuit" doctrine, that prior decision is binding.  Moreover, there is no basis to conclude that Massachusetts law has changed such that a different result should obtain now.  The

1

District Court's decision here following Circuit precedent was therefore correct and should be affirmed.

### A.     Factual Background

This interlocutory appeal centers on whether pooling rain waters on the roof surface of a hospital that contributed to extensive flooding to the hospital's interior falls within the term "surface waters" as used in the definition of "Flood" in an all-risk commercial property insurance policy.

### 1.     The Zurich Policies

Zurich American Insurance Co. ("Zurich") and American Guarantee and Liability Insurance Company ("AGLIC") issued similar commercial property insurance policies (collectively, the "Policies") to Medical Properties Trust, Inc. ("MPT") and Steward Health Care System, LLC ("Steward"), the owner and lessee/operator, respectively, of the Norwood Hospital (the "Hospital").  [A764, A567-745, A1000-1179].  The Policies generally provide coverage for property damage caused by a "Covered Cause of Loss," with a total limit of liability of $750 million for MPT and $850 million for Steward, subject to the terms, conditions and exclusions stated, including deductibles and sublimits.  [A579-89, A1014-22].  The Policies include coverage for loss due to "Flood," providing that Zurich or AGLIC "will pay for direct physical loss of or damage to Covered Property, Time Element loss and Special Coverages loss as provided by this Policy, if such loss or damage

is caused by Flood regardless of any other cause or event contributing concurrently

or in any other sequence of loss." [A618, A1049]. "Flood" is defined as:

> 7.23.    A general and temporary condition of partial or complete inundation of normally dry land areas or structure(s) caused by:
>
> 7.23.01.    The unusual and rapid accumulation or runoff of surface waters, waves, tides, tidal waves, tsunami, the release of water, the rising, overflowing or breaking of boundaries of nature or man-made bodies of water; or the spray there from all whether driven by wind or not; ....
>
> 7.23.02.    Mudflow or mudslides caused by accumulation of water on or under the ground.
>
> 7.23.03.    Flood also includes the backup of water from a sewer, drain or sump caused in whole or part by Flood.

[MPT Addendum at 20; A634, A1065[1]]. The policies include a sublimit for

"Flood," limiting coverage to $100 million for MPT and $150 million for Steward.

[A584, A1018].

## 2.    The Norwood Hospital Roofing System

Located in Norwood, Massachusetts, the Hospital consists of multiple

buildings as part of a complex, including the Lorusso building, which has an

outdoor courtyard on the second floor serving as the roof for the floors below.

[A492-94, A1282; *see* A400-01]. The courtyard is enclosed by walls defining the

second-floor spaces beyond, and the courtyard is sloped toward drain bowls that

are concealed beneath the walking surface pavers near the concrete deck. [A494].

---

[1] In the Steward policy, the "Flood" definition is in Section 7.22.

There is a membrane applied directly to the concrete deck and overlaid by drainage boards and insulation.  [A494].

The Lorusso building's main roof is a low slope roof surrounded by a parapet wall, creating a confined basin for water to be collected and discharged through roof area drains.  [A494].  The roof is configured with roof area drains seated into the deck and terminated to the membrane through clamping rings. [A494].  There are no overflow drains.  [A494].

Most, but not all, of the remaining roofs of the various buildings at the Hospital have parapet roofs.  [A493-94].  Many also include access points and pavers permitting individuals to walk on the roof.  [*See, e.g.,* A422, A430].  The roofs also contain drainage systems designed to allow water to drain from the roofs and are otherwise sealed with a roof membrane or waterproofing layer.  [A400-55].

### 3.    The Flood Event

On June 28, 2020, severe thunderstorms passed through Norwood, Massachusetts, resulting in more than four inches of rain in 90 minutes. [A765]. The rainwater accumulated in areas surrounding the Hospital, eventually flooding the basement areas of the two main buildings.  [A492].  Rainwater also accumulated on the roofs of various buildings of the Hospital and in the courtyard of the Lorusso building, infiltrated the Hospital through the roof systems and the Lorusso courtyard, and thereafter seeped or traveled throughout various areas of

4

the Hospital, damaging property. [A493]. The roofs' drainage systems became overwhelmed, with MPT's expert concluding that "during the weather event, the main building drains became obstructed or over capacitated which caused rain water to backup to the different roof areas and create a head of water several inches deep (varying throughout each roof) on top of the roof membrane or waterproofing layer." [A407; *see also* A422, A443, A453]. MPT's expert also variously concluded that "moisture infiltration occurred due to openings in the roof membrane" and "any head of water on the main roof area could have allowed increased moisture infiltration into the roof system through open seams or patches in the field of the roof membrane." [*e.g.*, A423, A448, A453]. The water infiltrating the Hospital through the roof systems and the Lorusso courtyard damaged parts of the building. [A494-95].

### 4.    MPT's Insurance Claim

MPT notified Zurich and its appointed adjuster, Sedgwick, of the water damage on June 28, 2020, which Zurich acknowledged the next day. [A497]. On August 20, 2020, Zurich sent an initial letter to MPT, stating:

> Any water damage sustained on the first, second and third floors appears to have resulted from water intrusion caused by wind driven rain and/or overflow of roof drains parapet flashings. ZAIC plans to separate the flood damage sustained on the basement and ground floors, including all time element losses, from the water intrusion property damage sustained on the first, second and third floors.

[A497-98].  The letter also stated that Zurich's "loss investigation [was] ongoing" and that Zurich "reserves the right, if its investigation warrants, to claim that the loss or a portion of the loss asserted ... is not, or may not be, within the coverage of the involved policy."  [A498].  On December 4, 2020, MPT made an initial submission of its coverage claim indicating losses due to Flood exceeding $100 million and additional losses of over $120 million due to "storm."  [A498].  On December 23, 2020, Zurich responded to the claim submission noting that the Hospital could be reconstructed to its pre-loss condition for roughly $32 million based on a "construction conceptual schedule" prepared by Zurich's consultant. [A499].  In the same letter, Zurich explained its position "that damage from water which entered the building at ground (or below) levels is subject to the Flood sublimit, as is water that accumulated on roof areas and then entered the building. Substantially all building and contents water damage results either from water entering at the ground level, or from surface water accumulating on roof areas and subsequently flowing into the building interior – all subject to the Flood sublimit." [A770].  Zurich sent MPT an updated loss assessment on December 24, 2021, estimating MPT's replacement cost loss estimate at around $47 million, with an actual cash value loss estimate of $36,093,766.95.  [A501].  As of May 2022, Zurich had already paid MPT the $36,093,766.95 cash value replacement.  [A501].

### 5.    Steward's Insurance Claim

Steward similarly notified AGLIC within a day of the storm, with AGLIC acknowledging the notice on June 20, 2020.  [A1288].  On August 6, 2020, AGLIC sent an initial letter to Steward containing similar substance as Zurich's letter to MPT and noting that its "loss investigation is ongoing" and that AGLIC "reserves the right, if its investigation warrants, to claim that the loss or a portion of the loss asserted … is not, or may not be, within the coverage of the involved policy." [A1288-89].  Steward made a preliminary claim submission on December 4, 2020, to which AGLIC responded on January 11, 2021, stating its position that Steward's claimed damages were subject to the $150 million Flood sublimit.  [A1289-90]. On February 5, 2021, Steward submitted a sworn proof of loss setting forth damages of roughly $220 million.  [A1290].  As of the date of the District Court's order granting Zurich and AGLIC's motions for partial summary judgment, AGLIC had already paid $87,697,593.72.  [A1292, Steward Br. at 10].

### B.    Procedural History

Zurich filed a declaratory judgment action against MPT on October 4, 2021, seeking a declaration that the Flood sublimit applied to MPT's claims.  [A18]. MPT answered and asserted counterclaims.  [A23-50].  Steward filed its action against AGLIC and Zurich on November 23, 2021, in part seeking a declaration that the Flood sublimit did not apply to Steward's losses.  [A896].

7

During initial scheduling conferences with the District Court in each action, the parties and the District Court agreed that the proper interpretation of the term "surface waters," as used in the definition of "Flood" in the policies, should be submitted for early resolution. [A6, A896]. The parties all briefed their motions for partial summary judgment, and after a hearing, MPT and Steward filed unopposed submissions addressing whether certification for interlocutory appeal under 28 U.S.C. § 1292(b) was appropriate. [*See* A7-9, A835, A899-901, A1310]. The District Court granted Zurich's motion for partial summary judgment in the *MPT* case on October 19, 2022, [A846], and AGLIC's motion for partial summary judgment in the *Steward* case on November 15, 2022, [A1308]. The District Court then certified both orders to this Court for immediate appeal. [A862, A1311]. Both MPT and Steward then filed petitions for interlocutory appeal, which this court granted on February 17 and 22, 2023, respectively. [A890, A1317].

C.    **The District Court's October 19, 2022 Order**

In allowing Zurich's motion for summary judgment, the District Court concluded – pursuant to the plain language of the policy, this Circuit's application of Massachusetts Supreme Judicial Court ("SJC") precedent, and interpretation of the SJC precedent itself – that "'Flood' includes surface waters above the ground." [A850-56]. Analyzing the policy language, the District Court first looked to dictionary definitions to determine the usual and ordinary meaning of "surface" as

8

well as the surrounding definition of "Flood" to find that the "the term 'surface waters' is not limited to the accumulation of water on the ground." [A851-52]. Because the definition of "Flood" also includes "mudflow or mudslides caused by accumulation of water on or under the ground," the District Court accordingly found that "requiring surface water to reach the ground is an implausible reading of the policy which makes specific reference to ground water in the next provision." [A852].

Next, the District Court turned to this Circuit's decision in *Fidelity Co-operative Bank v. Nova Casualty Co.*, 726 F.3d 31 (1st Cir. 2013), finding the decision "spot on." [A852]. As the District Court summarized, *Nova* "held that pooled water on the parapet roof of a five-story apartment building was surface water within the meaning of the insurance policy." [A852]. Quoting *Nova*'s interpretation of Massachusetts law, the District Court found that " 'damage resulting from water that flooded into properties after accumulating on artificial surfaces does not lose its character as "surface water" merely because it flowed along the artificial surface and seeped into or continued to flow onto the property.' " [A853 (quoting *Nova*, 726 F.3d at 40)].

Based on *Nova* and the SJC case law it interpreted, the District Court also rejected MPT's arguments that the District Court should not follow *Nova*. [A853-54]. First, the District Court rejected MPT's argument that *Nova* misapplied

9

Massachusetts law based on the SJC's description of "surface waters" as "waters from rain, melting snow, springs, or seepages, or floods that lie or flow on the surface of the earth and naturally spread over the ground but do not form a part of a natural watercourse or lake." [A853-54 (quoting *Boazova v. Safety Ins. Co.*, 462 Mass. 346, 354, 968 N.E.2d 385, 392 (2012))]. Based on the facts and holding of *Boazova*, the District Court found MPT's "reliance on the SJC's use of the word 'ground' is misplaced because in *Boazova* the SJC found that surface water includes waters on raised artificial surfaces like the raised patio or paved parking lots, not just water on the ground." [A854]. The District Court also rejected MPT's argument that water pooled on parapet roofs does not meet the SJC's description of "surface waters" because it cannot flow naturally off the roof in a diffuse and unconstrained state. [A855]. Again, the District Court cited *Boazova*, explaining that the rainwater on a raised patio was "surface water" there "even though the patio had a cant which directed water away from the house." [A855].

Next, the District Court rejected MPT's argument that this Circuit's holding in *Nova* is dictum because the "First Circuit reached the issue of surface water after the parties briefed the definition and the question [of] whether the issue was properly preserved for the court." [A855-56]. Thus, the District Court followed this Circuit's holding that "ponded water on the roof was surface water." [A856].

Finally, the District Court rejected two other MPT arguments it termed "last ditch, poorly developed." [A856]. First, the District Court rejected the argument that Zurich had not shown that there was an inundation of a normally dry structure, because the roof was clearly inundated and "[r]ainwater that ponds on a roof before it floods a building" can be an inundation for coverage under the Flood definition under *Nova*. [A856-57]. Second, it rejected the argument that construing the term "surface water" in the Flood definition to include rainwater that inundates the roof would have the practical effect of imposing a broad water exclusion. [A857].

## III.   SUMMARY OF THE ARGUMENT

This Circuit has already addressed in *Nova* the precise issue presented here. The facts and policy language at issue in *Nova* are indistinguishable from those at issue here, and the applicable Massachusetts case law interpreted in *Nova* has not changed. *Nova*'s holding that the term "surface waters" in a property insurance policy includes rainwater that has pooled on a parapet roof before infiltrating the building through the roof therefore applies. Under the law of the circuit rule, and pursuant to principles of fairness and sound judicial administration, *Nova* is dispositive of this appeal, and the Court should affirm the District Court's decisions.

MPT's arguments to the contrary all fail. *Nova*'s holding that ponded roof water is "surface water" is not mere dictum, as its finding was essential to, and

therefore part of, this Court's holding. It was also carefully considered and should control in any event.

MPT's arguments that this Court misapplied the relevant Massachusetts law in *Nova* also fail. The SJC's decisions in *Boazova* and *Surabian Realty* plainly include as "surface water": (1) rainwater on artificial surfaces, whether raised above ground level or not; (2) pooled rainwater that has accumulated due solely to the obstruction or failure of a drainage system; and (3) water that follows a path directed by man-made objects prior to causing damage to a building. As this Circuit recognized in *Nova*, the reasoning in the SJC's decisions fully supports a conclusion that rainwater that has pooled on a roof due to an overwhelmed drainage system, which then infiltrates the roof from various points, is "surface water" under the plain meaning of the Policies.

Finally, MPT's arguments attempting to introduce ambiguity into the plain language of the Policies all fail. All relevant authority consistently interprets the term "surface water" as the District Court did here, and MPT's arguments to the contrary do not make its interpretation reasonable. Moreover, hoping to bring its interpretation in line with the relevant authority, MPT attempts to introduce requirements into the Flood coverage that are plainly not present in the Policies. Indeed, the plain dictionary definitions of the words on which MPT relies support Appellees' interpretation (and therefore this Circuit's interpretation in *Nova*), as

12

does the surrounding Flood definition.  *Nova*, decided ten year ago, remains valid and is binding here.  Finally, given the clear precedent, there is no need to certify this question to the SJC.

## IV.     STANDARD OF REVIEW

This Court reviews the District Court's grant of summary judgment *de novo*. *Easthampton Congregational Church v. Church Mut. Ins. Co.*, 916 F.3d 86, 91 (1st Cir. 2019).  The construction of an insurance policy is a question of law.  *Id.*

## V.     ARGUMENT

### A.     This Court's Holding in *Nova* that "Surface Waters" in an All-Risks Insurance Policy Includes Pooled Rainwater on a Raised Parapet Roof Controls This Case

As the District Court's order recognized, this Circuit's decision in *Nova* is "spot on."  [A852].  *Nova* controls here, and MPT's arguments to the contrary do nothing to change that.[2]

#### 1.     *Nova* Is Indistinguishable

Both the facts and operative policy language in *Nova* are indistinguishable from the facts and policy language at issue here.  Moreover, this Court decided the "surface waters" issue in *Nova* pursuant to the same Massachusetts precedent argued by the parties.

---

[2] Because Steward's brief incorporates the arguments made in MPT's brief, Appellees primarily respond to MPT's arguments and address Steward's factual assertions only as necessary. *See* Steward Br. at 13-14.

13

The building in *Nova* was a five-story mixed-use rental property with a flat, rubber-covered roof. *Nova*, 726 F.3d at 33. The roof contained a drainage system and two glass skylights. *Id*. The roof also included parapet walls. *Id*. at 38. On September 6, 2008, a tropical storm brought heavy rains that "resulted in the accumulation of a significant amount of water on the roof" that "overwhelmed the rooftop drain, causing the water to pool on the roof and eventually leak through the building's two skylights. The water caused substantial damage to the interior of the building...." *Id*. at 33.

The facts here are strikingly similar. Most of the Hospital's roofs are parapet roofs with drainage systems. [A493-94; A400-55]. The other point of entry of above-ground water was the second-floor courtyard of the Lorusso building, which is enclosed by vertical walls and slopes toward drain bowls. [A766]. During the storm event, rainwater pooled on the roofs of various buildings of the Hospital and in the courtyard of the Lorusso building, infiltrated the Hospital through the roof systems and the Lorusso courtyard, and thereafter seeped or traveled throughout various areas of the Hospital. [A493]. The water infiltrating the Hospital through the roof systems and the Lorusso courtyard damaged parts of the building. [A494-95].

The policy in *Nova* was an "all-risk policy" that covered "direct physical loss or damage to the building subject to any specific exclusion stating otherwise."

14

*Nova*, 726 F.3d at 33.  Though the Policy initially excluded coverage for "surface water," an endorsement added flood coverage for loss attributable to "[f]lood, meaning a general and temporary condition of partial or complete inundation of normally dry land areas due to: ... [t]he unusual or rapid accumulation or runoff of surface waters from any source."  *Id.*

Here, the Policies provide coverage for Flood "regardless of any other cause or event contributing concurrently or in any other sequence of loss," [A618, A1049], with "Flood" defined as: "A general and temporary condition of partial or complete inundation of *normally dry* land areas or *structure(s)* caused by: ... The unusual and rapid accumulation or runoff of surface waters ...."  [MPT Addendum at 20; A634, A1065 (emphasis added)].  Thus, the only differences in language between the policy in *Nova* and the Policies here are that the MPT and Steward Policies include anti-concurrent causation language and clarify that inundation by surface waters explicitly can occur to normally dry "structures" as well as land areas.  The term "surface waters" and its surrounding context is otherwise indistinguishable.

Finally, in *Nova*, this Court interpreted the exact same Massachusetts SJC decisions argued by MPT here.  *See Nova*, 726 F.3d at 39-40 (interpreting *Boazova* and *Surabian Realty Co. v. NGM Ins. Co.,* 462 Mass. 715, 971 N.E.2d 268 (2012));

15

MPT Br. at 26-35). Thus, the facts, policy language, and applicable law in *Nova* are the same as those at issue here. Naturally, then, its holdings apply.

### 2. *Nova's* Holding that the Term "Surface Waters" Includes Rainwater that Has Pooled on a Roof Is Dispositive

An analysis of *Nova* plainly demonstrates that this Court's holding that pooled water on a roof is "surface water" applies to this case. The holding in *Nova* involved a straightforward application of Massachusetts law. *See Nova*, 726 F.3d at 39-40. In *Nova*, Fidelity (as assignee of the insured homeowners) argued that it was entitled to coverage for the damage caused by the pooling water on the building's roof because (1) contrary to the district court's holding, the policy's "rain limitation" exclusion did not apply because the efficient proximate cause of the damage was the blocked or inadequate roof drain, and the "rain limitation" provision only excluded damage "caused by rain"; and (2) the pooled rain should be characterized as "surface water" under Massachusetts law and considered mutually exclusive and legally distinct from "rain," such that coverage would not be excluded because the policy's amendatory endorsement restored coverage for damage from "surface water." *Id*. at 35-36. Nova, on the other hand, primarily argued that (1) the district court properly determined that the rain limitation excluded coverage because the damage was "caused by rain"; (2) that interpreting the rain as "surface water" was a "tortured reading" of an otherwise clear exception, and that *Boazova* and *Surabian Realty* did not deal with the rain

16

limitation exclusion; and (3) that Fidelity waived the argument that the water damage was covered under the amendatory endorsement providing coverage for "surface waters" by not raising it in the district court on summary judgment. *Id*. at 36, 38.

In beginning its analysis, this Court first set forth the principles of insurance policy interpretation under Massachusetts law, including the principle that "[w]here 'the relevant policy provisions are plainly expressed, those provisions must be enforced according to their terms and interpreted in a manner consistent with what an objectively reasonable insured would expect to be covered.'" *Id*. at 36-37 (quoting *Vicor Corp. v. Vigilant Ins. Co.,* 674 F.3d 1, 11 (1st Cir. 2012) (citing *City Fuel Corp. v. Nat'l Fire Ins. Co. of Hartford,* 446 Mass. 638, 846 N.E.2d 775, 778-79 (2006))).  Under those principles, the Court's contract analysis focused on two endorsements to the policy: (1) the "Amendatory Endorsement— Habitational Program," which, as relevant, removed the exclusion in the body of the policy for loss or damage caused "directly or indirectly ... regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage" by water "that backs up or overflows from a sewer, drain or sump"; and (2) the "Flood Coverage" amendatory endorsement that restored coverage for Flood, defined to include "surface water." *Id*. at 37, 40.

17

First, because the Habitational Program endorsement deleted the exclusion for damage caused by water that backs up or overflows from a drain and its anti-concurrent causation language, this Court undertook an "efficient proximate causation" analysis. *Id*. at 37-38. Based on Nova's experts, the Court found that the "blocked or inadequate drain was overwhelmed by the severe rainstorm," and thus the failure of the drain, not the rain, was the "efficient proximate cause" of the water damage. *Id*. at 38. Thus, the policy's exclusion for damage "caused by rain" was inapplicable, and the district court erred in concluding it precluded coverage. *Id*. at 38.

The Court then continued to analyze the "district court's determination that the water damage resulted from 'surface water.'" *Id*. at 39. In a footnote, the Court explained its decision to address the surface water exclusion separately based on Fidelity's two arguments on appeal "because the policy at issue treats coverage under each respective provision differently. Under the policy, there is no deductible for damage if the rain limitation does not apply. However, for damage resulting from 'surface water,' there is a $25,000 deductible." *Id*. at 39 n.3. Moreover, the district court had addressed the issue by concluding that the policy's surface water exclusion barred coverage. *Id*. at 35.

The Court first addressed Nova's argument that Fidelity had waived the issue on appeal, finding that the issue was not waived because it was "an issue

18

directly passed on" below, and thus Fidelity was "free to address the issue so raised in this appeal." *Id*. at 39.  Moreover, in moving for reconsideration following the district court's order, Fidelity raised the issues surrounding the "surface water" exclusion and the Flood Coverage endorsement and the "legal distinction between 'rain' and 'surface water,' " and thus could not be "construed as having voluntarily relinquished a known right since it expressly raised and argued the issue in a motion whose denial was timely noticed for appeal." *Id*.

Addressing whether the pooled rain on the roof was "surface water," the Court looked to the SJC's decision in *Boazova*, including its definition of "surface water" as "waters from rain, melting snow, springs, or seepage, or floods that lie or flow on the surface of the earth and naturally spread over the ground but do not form a part of a natural watercourse or lake." *Id*. (quoting *Boazova*, 462 Mass. at 354, 968 N.E.2d at 392).  The Court also noted that water that had accumulated on a patio "higher than the grade of the house's foundation" and seeped into the house "fit within the definition of 'surface water' " because the "mere migration of water from the patio" into the house "did not change its essential character as 'surface water.' " *Id*. at 40 (quoting *Boazova*, 462 Mass. at 355, 968 N.E.2d at 393).  The Court also analyzed *Surabian Realty* and the rain collecting on the parking lot in that case, noting the SJC's holding that " '[r]ainwater that collects on the ground is considered surface water even when, but for an obstruction, the water would have

19

entered a drainage system.' " *Id.* (quoting *Surabian Realty*, 462 Mass. at 718-19,

971 N.E.2d 268). Based on this analysis, this Court found "that damage resulting

from water that flooded into properties after accumulating on artificial surfaces

does not lose its character as 'surface water' merely because it flowed along the

artificial surface and seeped into or continued to flow onto the property." *Id.*

Thus, the Court upheld the district court's finding that the "ponded" water on the

parapet roof was "surface water." *Id.*

Finally, as relevant to coverage under the Flood Coverage endorsement, the

Court concluded that "the water damage resulting from entry of the "surface

water" into the interior of the building *was explicitly covered under the plain and

unambiguous language of the Policy*." *Id.* (emphasis added). Thus, the district

court erred by not considering the language of the amendatory endorsement, and

the Court reversed and remanded for the district court's reconsideration "in

accordance with the strictures of this opinion" in part because the damage "would

have been covered by the amendatory endorsement of the Policy as 'surface

water' " *Id.* at 41.

As the District Court here recognized, *Nova* "is spot on," [A852], and its

holding that "surface waters" include pooled water on a roof under the plain

language of the Policies under Massachusetts law controls this case.

20

### 3. This Panel Is Bound by *Nova* Under the "Law of the Circuit" Rule and Stare Decisis

Given *Nova's* careful analysis of Massachusetts cases on nearly identical facts, there is every reason to follow it here. Even so, the "law of the circuit" rule requires the Court to follow the precedent announced by previous panels of this Circuit. "The 'law of the circuit' rule is a subset of stare decisis. It is one of the building blocks on which the federal judicial system rests. Under the rule, newly constituted panels in a multi-panel circuit court are bound by prior panel decisions that are closely on point." *San Juan Cable LLC v. Puerto Rico Tel. Co.*, 612 F.3d 25, 33 (1st Cir. 2010). Further:

> Although this rule is not 'immutable,' the exceptions are extremely narrow and their incidence is hen's-teeth-rare. Such exceptions come into play only when the holding of the prior panel is contradicted by controlling authority, subsequently announced (say, a decision of the authoring court en banc, a Supreme Court opinion directly on point, or a legislative overruling), or in the rare instances in which authority that postdates the original decision, although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind.

*Id*. (citations omitted). "[I]t remains true that a panel may not disregard binding precedent simply out of disagreement." *United States v. Cardales-Luna*, 632 F.3d 731, 735 (1st Cir. 2011). "Once we have decided a legal question and articulated our reasoning, there is usually no need for us to repastinate the same soil when another case presents essentially the same legal question." *Nevor v. Moneypenny Holdings, LLC*, 842 F.3d 113, 125 (1st Cir. 2016) (internal quotations omitted).

21

"Under Massachusetts law, the interpretation of an insurance policy is a question of law for the court." *Nova*, 726 F.3d at 36.

The rule's application here is beyond question. The facts, policy language, and applicable law at issue are the same as in *Nova* in every material way. *Nova* carefully considered each to reach a well-reasoned holding that is directly on point here. Moreover, given that the exact same Massachusetts authority is at issue and there are no fresh developments under either the SJC's or this Circuit's case law, this is not a "hen's-teeth-rare" case where an exception to the law of the circuit rule applies.

As MPT's arguments make clear, it advocates for a holding that would directly contradict this Circuit's decision in *Nova*. But such an approach is not only foreclosed by the "law of the circuit" rule, it is also short-sighted. Both insurers *and* insureds should not be left to guess whether this Court's and the SJC's precedent will apply to the same facts and same policy language. Both insurers and insureds need predictability to understand and structure their flood coverage.

### 4. MPT's Attempt to Distinguish *Nova* By Recasting *Nova*'s Analysis as Applying Only to Grants of Coverage Is Unavailing

Despite the near overlap of material facts between *Nova* and this case, MPT attempts to distinguish *Nova*'s holding by arguing that this Circuit did not address the meaning of "surface waters" in relation to whether a reasonable insured could

construe the term as it proposes, and thus did not address the "dispositive question" of this appeal.  MPT Br. at 20-23.  MPT's attempt to twist *Nova*'s holding falls flat.

First, this argument might have merit only if *Nova* had found the term "surface water" ambiguous.  Under Massachusetts law, the "burden of demonstrating that an exclusion exists that precludes coverage is on the insurer, and any ambiguities in the exclusion provision are strictly construed against said insurer."  *Nova*, 726 F.3d at 36 (cleaned up).  But as the *Nova* Court also noted, contrary to MPT's argument, where "the relevant policy provisions are plainly expressed, those provisions must be enforced according to their terms and interpreted in a manner consistent with what an objectively reasonable insured would expect to be covered."  *Id*. at 36-37 (internal quotations omitted).  The Court did not find the term ambiguous; rather, it looked to the definition in *Boazova* for the term's plain meaning and found coverage for the damage resulting from the entry of "surface water" through the roof "was explicitly covered *under the plain and unambiguous language* of the Policy."  *Id*. at 39-40 (emphasis added).

Additionally, any argument that the definition of "surface water" changes character based on whether the provision at issue expands or limits coverage is not only unprincipled, it is also refuted by *Boazova*.  There, the SJC defined "surface water," finding it not to be ambiguous in applying an exclusion that limited

23

coverage, and stated: "Although the language of the policy and the endorsement is challenging to even the most careful reader ... we conclude that Boazova's claimed loss ... is excluded from coverage by unambiguous provisions in the policy." *Boazova*, 462 Mass. at 352, 968 N.E.2d at 390. If "surface water" was subject to different definitions based upon whether the policy language at issue granted or restricted coverage, that distinction would have been evident in comparing *Boazova* to *Nova*. But that is not the case—both cases applied the same definition of the unambiguous phrase "surface water" to reach the same conclusion.

Moreover, the Flood Coverage endorsement in *Nova* and the Flood coverage in the Policies here contain nearly identical coverage-granting language.[3] Here, the Policies provide coverage for Flood "regardless of any other cause or event contributing concurrently or in any other sequence of loss," [A618, A1049], with "Flood" defined as: "A general and temporary condition of partial or complete inundation of normally dry land areas or structure(s) caused by: ... The unusual and rapid accumulation or runoff of surface waters ...." [MPT Addendum at 20; A634, A1065]. In *Nova*, the Flood Coverage endorsement provided:

---

[3] Notably, this Court interpreted the "surface water" coverage in *Nova* in part because the coverage provided for a deductible (i.e., a smaller recovery for the insured) that did not apply to other parts of the policy. *Nova*, 726 F.3d at 39 n.3. In that respect its holding affected a limit of liability, similar to this case.

> This endorsement applies to the Covered Property and Coverages for which a Flood Limit of Insurance is shown in the Flood Coverage Schedule or in the Declarations....
>
> The following is added to the Covered Causes of Loss:
>
> Flood, meaning a general and temporary condition of partial or complete inundation of normally dry land areas due to: ...
>
> The unusual or rapid accumulation or runoff of surface waters from any source.

[A113]. MPT's attempt to transform the Policies' Flood *coverage* into an *exclusion* and distinguish it from the substantively identical *coverage* at issue in *Nova* is at odds with the language of the policies. That MPT's recovery under the Flood coverage is subject to a sublimit in this case simply does not mean that its claim is excluded by the Policies. It also does not necessarily mean that its recovery is limited, as losses may not exceed the sublimit. MPT simply alleges it is entitled to recovery beyond the Flood sublimit, but under the same logic, an insured could turn any coverage grant into an "exclusionary clause" simply by alleging its losses exceed the applicable limit. MPT's first attempt to escape *Nova* fails.

### 5. *Nova*'s Interpretation of "Surface Waters" Plainly Is Not Dictum

MPT's next attempt to escape *Nova* depends entirely on whether *Nova*'s interpretation of the term "surface waters" is dictum. MPT Br. at 23. As is clear from the preceding discussion of *Nova*, it is not. *Nova*'s application of

Massachusetts law was both essential to its holding that there was coverage under the Flood Coverage endorsement and carefully considered.

> ### a)     *Nova's* Interpretation of "Surface Waters" Is Not Dictum

MPT advances three arguments as to why the *Nova* Court's finding that ponded water on the parapet roofs is "surface water" is dictum, all of which misunderstand what it means for judicial language to be dictum. The first argument may be disregarded, as MPT merely reiterates its previous argument that "the proper interpretation of 'surface water' in the Zurich Policy is different than the 'surface water' coverage issue presented in *Nova*." MPT Br. at 25. This argument, meritless by itself as shown above, also is simply irrelevant to whether the Court's language in *Nova* was dictum.

For its remaining two arguments, MPT argues that *Nova*'s "surface water" holding "was not necessary to its ruling in favor of Fidelity on other grounds," and the insurer in *Nova* did not contest the district court's finding that the ponded roof water was "surface water" on appeal, arguing instead that it was irrelevant. MPT Br. at 25-26. These fail as well.

As this Court has explained:

> [W]hen a statement in a judicial decision is essential to the result reached in the case, it becomes part of the court's holding. The result, along with those portions of the opinion necessary to the result, are binding, whereas dicta is not. Dictum constitutes neither the law of the case nor the stuff of binding precedent; rather, it comprises

26

observations in a judicial opinion or order that are 'not essential' to
the determination of the legal questions then before the court.

*Arcam Pharm. Corp. v. Faria*, 513 F.3d 1, 3 (1st Cir. 2007) (internal quotations

and citations omitted).  While MPT quotes this language, it fails to understand its

import.  The *Arcam* Court further expounded that "[d]ictum is superfluous

content—'an assertion in a court's opinion of a proposition of law which does not

explain why the court's judgment goes in favor of the winner.' " *Id*. (quoting

Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L.

Rev. 1249, 1256 (2006)).  Indeed, the Court determined that the language at issue

was not, in fact, dictum.  *Id*. at 3.  On the other hand, as the Supreme Court has

long recognized, alternative holdings are not dicta: "[W]here there are two

grounds, upon either of which the judgment of the trial court can be rested, and the

appellate court sustains both, the ruling on neither is obiter, but each is the

judgment of the court, and of equal validity with the other." *Union Pac. R. Co. v.*

*Mason City & Ft. D.R. Co.*, 199 U.S. 160, 166 (1905).  Put another way,

"[w]henever a question fairly arises in the course of a trial, and there is a distinct

decision of that question, the ruling of the court in respect thereto can, in no just

sense, be called mere dictum." *Id*.; *see also Commonwealth v. United States*, 333

U.S. 611, 623 (1948) ("Instead, as we were asked to do and rightly could do on the

record and the issues, we decided both issues, and the judgment rested as much

27

upon the one determination as the other. In such a case the adjudication is effective for both.").

In *Nova*, the question of whether the water accumulation on a roof was "surface water" was one of two "issues presented" on appeal. *Nova*, 726 F.3d at 33; *see* [A94-95]. The Court spent two pages addressing the argument, including a review and analysis of *Boazova* and *Surabian*, before affirming the trial court's finding that the ponded water on the roof was "surface water" and overturning the trial court's determination that the surface water damage was not covered. *Nova*, 726 F.3d at 39-40. The Court then held that the district court erred by failing to find coverage under the Flood Coverage endorsement despite first determining that the water ponded on the roof was "surface water" and remanded to the district court to reconsider in accordance with the "strictures of this opinion," including its holding that the damage "would have been covered by the amendatory endorsement of the Policy as 'surface water.' " *Id*. at 40-41. Thus, the issue was presented to the Court, the Court analyzed it, and it then made a ruling necessary to its decision on the question that was explicitly binding on the trial court below. Because each of its statements in its discussion was necessary to reach its conclusion that the district court had erred, each statement, including the finding that "surface waters" includes ponded water on a parapet roof, was part of its holding. Whether or not the holding was necessary to find coverage for Fidelity or

the insurer strategically determined to argue the issue in terms of waiver, as MPT argues, has no impact on its binding effect.[4]

The additional cases MPT cites only further demonstrate the difference between dictum and the *Nova* Court's analysis.  In *United States v. Starks*, this Court concluded that language from a prior First Circuit decision was dictum where the relevant language "was presented without analysis" and "addressed a broader argument ... that the defendant had waived." 861 F.3d 306, 323 (1st Cir. 2017). In contrast, *Nova* explicitly held that the argument regarding "surface water" had not been waived, and it was, in fact, one of two "issues presented" on appeal. 726 F.3d at 39.  And in *In re Grand Jury Proceedings*, this Court found an isolated sentence in a prior decision that did not address the issue before the court could not "bear the weight placed upon it."  744 F.3d 211, 216 (1st Cir. 2014).  In *Nova*, the Court undertook a careful analysis of one of two issues presented on appeal to reach its holding, which is the same issue under the same facts presented

---

[4] Moreover, though the insurer in *Nova* relied primarily on its waiver argument on appeal, it also argued that the rain limitation applied because "it is clear that the Flood Coverage is meant to address flooding which occurs at the **ground level** (or 'normally **dry land area**') of a covered property, but is not intended to cover 'flooding' caused by rain which enters through the roof or walls (such as occurred here), which is specifically excluded by the rain limitation unless the 'building or structure first sustain[ed] damage by a Covered Cause of Loss to its roof or walls through which the rain ... enters." [A234 (emphasis in original)].  The insurer thus presented essentially the same argument as MPT does here, which the Court rejected.

here. 726 F.3d at 39-41. *Nova*'s holding that "surface waters" includes ponded

water on a parapet roof under an all-risks insurance policy is not dictum.

### b)     Nova's "Surface Water" Analysis Is Carefully Considered

Even if the "surface water" discussion in *Nova* could be considered dictum

(and it cannot), it is a "carefully considered" portion of the decision and, therefore,

is entitled to " 'great weight, and may even ... be regarded as conclusive.' " *In re*

*Montreal Maine & Atl. Rwy., Ltd.,* 953 F.3d 29, 45 (1st Cir. 2020) (alterations in

original) (quoting *McCoy v. Mass. Inst. of Tech.,* 950 F.2d 13, 19 (1st Cir. 1991)).

In determining the weight to be assigned dictum, "[m]uch depends on the character

of the dictum. Mere obiter may be entitled to little weight, while a carefully

considered statement..., though technically dictum, must carry great weight, and

may even ... be regarded as conclusive." *McCoy,* 950 F.2d at 19 (quoting Charles

A. Wright, *The Law of Federal Courts* § 58, at 374 (4th ed. 1983)) (alterations in

original).

In *McCoy,* the First Circuit determined that it was bound by a Supreme

Court footnote, even though such footnote was clearly dictum, because it carried

the "earmarks of careful consideration," including italicizing a word. *Id.* The First

Circuit explained that "[i]f lower courts felt free to limit Supreme Court opinions

precisely to the facts of each case, then our system of jurisprudence would be in

shambles, with litigants, lawyers, and legislatures left to grope aimlessly for some

semblance of reliable guidance."  *Id.*  Furthermore, the deference afforded

considered dictum is not limited to Supreme Court opinions.  In *In re Montreal*

*Maine,* the First Circuit afforded the same "great weight" to its own prior dictum.

953 F.3d at 45.  The "surface water" discussion in *Nova* is clearly "carefully

considered."  Though the *Nova* discussion is not dictum, it would be conclusive of

this case even if it were.

> **B.     Both *Nova* and the District Court Correctly Interpreted the SJC's Decisions in *Boazova* and *Surabian Realty* to Include Pooled Water on a Roof that Penetrates the Building from Above**

MPT next argues that the District Court, and therefore this Court,

erroneously construed *Boazova* and *Surabian Realty* to construe the SJC's

definition of "surface waters" to: (1) encompass pooled rainwater above ground

level; and (2) encompass water enclosed by a parapet roof because the water could

not "naturally spread" in a "diffused state."  MPT Br. at 26-27.  Again, these

arguments are directly at odds with this Court's decision in *Nova*, which

interpreted both authorities under the same definition of "surface water" and under

the same material facts at issue here; but they also run counter to *Boazova* and

*Surabian Realty*.

> **1.     MPT Misreads *Boazova* as Requiring that Rainwater Must Be Located at "Ground Level" to Satisfy the SJC's Definition of "Surface Water"**

This Court summarized the key holding of *Boazova* as follows:

> In *Boazova*, the Supreme Judicial Court found that water that had
> accumulated on a patio that was "higher than the grade of the house's
> foundation" which "simply flowed along the patio and seeped into
> Boazova's house" fit within the definition of "surface water": "The
> mere migration of water from the patio into the wooden sill, floor
> joists, and wall studs did not change its essential character as 'surface
> water.' "

*Nova*, 726 F.3d at 40 (quoting *Boazova*, 462 Mass. at 355, 968 N.E.2d at 392-93).

MPT does not disagree with these statements (nor could it), but instead focuses its

argument solely on whether the patio in *Boazova* was "at-ground level," rather than

a "raised patio," as the District Court described it.  MPT Br. at 28-33; [A854].

In *Boazova*, rainwater flowed across the patio attached to the back wall of

the house, where about ten to twelve inches of the exterior were below the grade of

the patio, allowing the rainwater to rot the siding and migrate down to the

foundation.  *Boazova*, 462 Mass. at 349, 968 N.E.2d at 389.  Thus, rainwater from

an artificial surface that directed the water to the wall of the building above the

ground level of the building was found to be "surface water," which triggered the

policy's "surface water" exclusion despite the loss being otherwise covered.  *Id*. at

356, 968 N.E.2d at 393; *see* [A328 (showing sketch of house with a relatively flat

concrete patio situated above the top of floor joists)].

As the District Court explained, MPT's reliance on the word "ground" in the

SJC's definition of "surface water" was "misplaced because in *Boazova* the SJC

found that surface water includes waters on raised artificial surfaces like the raised

32

patio or paved parking lots [as in *Surabian Realty*], not just water on the ground." [A854 (alteration added)]. There is no dispute that the patio in *Boazova* was poured on top of the surrounding soil to connect it to the house, *Boazova*, 462 Mass. at 349, 968 N.E.2d at 389; [A329][5], and, like a roof, it is an artificial surface. Nor is there a dispute that the water in *Boazova* flowed directly from the patio to the house to cause damage, and thus there is no need for "surface water" to meet natural ground to maintain its "essential character as 'surface water.' " *Boazova*, 462 Mass. at 355, 968 N.E.2d at 393.

Though surface water can accumulate on artificial surfaces on top of natural earth, MPT argues that the artificial surfaces must nonetheless be at "ground-level" because the SJC's definition of "surface water" as "waters from rain ... that lie or flow on the surface of the earth and naturally spread *over the ground* ...." MPT Br. at 45. MPT concedes (as it must) that "surface of the earth" includes artificial surfaces under Massachusetts law, but it maintains those surfaces must be at

___

[5] MPT contests that the patio was "raised," but it acknowledges that it sat "directly *on top* of the soil." MPT Br. at 31 (emphasis added). While the patio was at the "same elevation as the adjoining soil in the back yard on the *high side* of the hill," MPT Br. at 30 (emphasis added), it was also slightly raised from the low side of the hill where it met the back of the house, *Boazova*, 968 N.E.2d at 389, as the sketch of the patio illustrates [A329]. The District Court's characterization of the patio as "raised" is not incorrect as MPT argues. Rather, MPT's characterization of the patio as "in-ground," MPT Br. at 28, implies the entirety of the patio was built into the hill or graded according to the hill's natural slope, which is nowhere to be found in the facts.

33

"ground-level," which it does not define further, but suggests that still means level with the natural earth or soil.  [*See* MPT Br. at 32-33].  This interpretation cannot be squared with the reasoning in *Boazova*.[6]

In supporting its conclusion that the water that accumulated on the concrete patio and seeped into the home was "surface water," the SJC in *Boazova* cited favorably two analogous cases from other jurisdictions.  The first, *Cameron v. USAA Prop. & Cas. Ins. Co.*, found that melted snow and rain that ran from a raised patio, down a set of stairs, and into the homeowners' basement was "surface water."  733 A.2d 965, 969 (D.C. 1999).  *Cameron*, in analyzing the "surface water" issue, in turn relied on and expressly agreed with two cases that both found the accumulation of water on a roof is "surface water."  *Id*. (citing *Bringhurst v. O'Donnell*, 124 A. 795 (Del. Ch. 1924)[7]; *Sherwood Real Estate and Inv. Co. v. Old*

---

[6] It is also inconsistent with this Court's definition of "land," which "include[s] not only the soil, but everything attached to it, whether attached by the course of nature, as trees, herbage, and water, or by human hands, as buildings, fixtures, and fences."  *Nova*, 726 F.3d at 40 (quoting 63C Am. Jur. 2d Property § 13).

[7] MPT distinguishes *Bringhurst*, and all subsequent cases that apply its understanding of the definition of "surface water," because its definition was not interpreted in an insurance policy, but rather in interpreting an easement to dispel "surface waters."  MPT Br. at 43-44.  This distinction carries little weight, especially here.  Indeed, *Boazova* favorably cites *Cameron*, which in turn relies heavily on *Bringhurst*.  Moreover, the definition from *DeSanctis* applied in *Boazova* and *Surabian* was not interpreted in an insurance policy either, or even a written instrument.  Instead, the *DeSanctis* Court noted the definition in a footnote to provide color to a land use dispute in which the plaintiff property owner alleged his land was irreparably harmed by his neighbor's negligent or unreasonable use of

34

*Colony Ins. Co.*, 234 So. 2d 445 (La. Ct. App. 1970)). The SJC also cited *Crocker v. American Nat'l Gen. Ins. Co.*, another appellate case finding that rainwater collected on a raised patio that flowed into the house was "surface water." 211 S.W.3d 928, 936 (Tex. Ct. App. 2007). There, the court disagreed with the insured's position that water must hit the dirt or soil and dismissed its concerns that artificial surfaces can accumulate surface waters, plainly finding that "an average reasonable person would not limit surface water to rain falling only on dirt and not on any paved surfaces *or other structures*." *Id.* (emphasis added). Thus, there is no way to read to *Boazova*, as MPT does, to mean that the SJC would have ruled differently if the patio at issue was higher off the ground—indeed, both the court's express reasoning and the decisions on which it relies make clear that rainwater that has accumulated on an artificial surface, elevated or not, and seeps into property is "surface water" within the plain meaning of an all-risk insurance policy. And this Court has already recognized that under the same facts at issue

---

his land allowing surface water to inundate his property, allegedly causing wetland conditions. *DeSanctis v. Lynn Water & Sewer Comm'n*, 423 Mass. 112, 115 n.6, 666 N.E.2d 1292, 1295 n.6 (1996) (citing Restatement (Second) of Torts § 846 (1979)). Notably, the Restatement has since been reworded to *remove* the description "and naturally spread over the ground" from the definition of "surface water," Restatement (Second) of Torts § 846; [MPT Addendum at 26], and it appears this reworded definition is also cited in *Boazova*, 462 Mass. at 354, 968 N.E.2d at 392 (citing Restatement (Second) of Torts § 846, cmt. b). Etymology does not help MPT's case.

here.  *See also Oak Hill Inv. IV LLC v. State Farm Fire & Cas. Co.*, 2017 WL

4286779, at *3-4 (N.D. Ohio Sept. 27, 2017), *aff'd,* 737 F. App'x 722 (6th Cir.

2018) (noting this Court's decision in *Nova* when applying "surface waters"

exclusion and finding "the plain meaning of the word 'ground' to include the roof

on which a man could walk or an object could rest" like the roofs of the Hospital

and the courtyard).

The SJC's support for the reasoning that surface water can accumulate on

"other structures" indicates the same reasoning should apply to rooftop courtyards

or parapet roofs with walking access, like those on the Hospital.  There is no

principle distinguishing a courtyard on the second floor of a building—essentially

a raised patio for people to congregate—from a raised patio adjacent to a building.

Nor is there a basis to distinguish any other artificial surface, like a roof, especially

one upon which people can walk.  Under MPT's interpretation, water on a ground

level patio may be surface water, and water on a patio about a foot above a

building foundation may be surface water (presumably because this is still "ground

level," or close enough), but a patio on a second floor can under no circumstances

accumulate surface water.  The logical extension of MPT's interpretation is to

create a "height test" that is not found in law, logic or the language of the Policies

and would impose needless uncertainty.  Instead, "[i]n the case of a building

erected on land, the roof is to be regarded as an artificial elevation of the earth's

36

surface.  When it intercepts the falling rain or snow, it therefore gathers surface

waters." *Bringhurst*, 124 A. at 797.  That is the logic of *Boazova*, as this Court has

recognized.  The same interpretation of "surface waters" should apply here.

> **2.    MPT's Argument that the Rainwater on the Parapet Roof Is Not "Surface Water" Because It Could Not "Naturally Spread" in a "Diffused State" Misunderstands the SJC's Decisions Holding that Water that Seeps Naturally Into a Building Is "Surface Water."**

MPT argues that the District Court also erred in interpreting SJC precedent

because the rainwater that fell on the Hospital roofs and the Lorusso courtyard

could not "'naturally spread' in a 'diffused state' to any other location, much less

the ground."  MPT Br. at 35.  MPT again misunderstands the SJC's decisions in

*Boazova* and *Surabian Realty* and ignores the undisputed facts of how the water

entered the Hospital from the roof and the courtyard.

In *Boazova,* the patio at issue had a cement cant (an angled raised area)

along the edge of the patio designed to direct water away from the house.  462

Mass. at 347, 968 N.E.2d at 388.  The existence of the cant, which was meant to

direct the flow of water, did not prevent the SJC from finding that water infiltrating

from the patio constituted "surface water."  In *Surabian Realty*, the SJC found that

rainwater that collected in a paved parking lot "retains its character as surface

water ... even when, but for an obstruction, the water would have entered a

drainage system."  462 Mass. at 719, 971 N.E.2d at 272.  The existence of a drain

blockage, allowing the water to pool, did not prevent the SJC from finding that water that infiltrated the building from the parking lot was "surface water."

Based on the SJC's decisions, this Court in *Nova* then found that rainwater that pooled on a parapet roof due to the blockage of the drainage system also was "surface water." *Nova*, 726 F.3d at 38-41. *See also Capital Mortg. Sols., LLC v. Cincinnati Ins. Co.*, __ F. Supp. 3d __, 2023 WL 3632705, at *5 (E.D. Mich. May 24, 2023) (holding that rainwater that flowed to patio and accumulated there only due to drainage failure was still "surface water" that entered basement because it "followed no definite course, given that it veered away from the planned drainage path and instead moved unexpectedly down the patio and into the basement"); *Cameron*, 733 A.2d at 970 ("[R]egardless of the Camerons' purpose in sloping the patio, the water that landed on that structure flowed naturally down the stairs and into the basement. It did not follow a defined course or channel. Rather, the water located a means of natural drainage. The fact that the patio was *intended* to channel water to the driveway cannot alter the result where, as here, the water was never, in fact, channeled."); *Smith v. Union Auto. Indem. Co.*, 323 Ill. App. 3d 741, 748, 752 N.E.2d 1261, 1267 (2001) ("There is no indication in the case law that 'naturally' should be interpreted to mean completely untouched or unaffected by man-made structures.... [I]f we did adopt plaintiffs' proposed definition, it would be nearly impossible for surface water to exist, given the highly developed state of

our society and the fact that few places without roads or other man-made structures exist today. This causes us to conclude that plaintiffs' proposed definition of 'surface water' does not reflect the popular and ordinary meaning of the term. The average reasonable person would not limit surface water to water whose flow has not been altered in any way by paved surfaces, buildings, or other structures.").

Here, the rainwater accumulated on the roofs of various buildings of the Hospital and in the courtyard of the Lorusso building, infiltrated the Hospital through the roof systems and the Lorusso courtyard, and thereafter seeped or traveled throughout various areas of the Hospital, damaging property. [A493]. The fact that it pooled on the roof due to an overwhelmed drainage system or that its direction was generally limited by the parapets, does not change the fact that the water seeped through the roof systems and the courtyard in various places as it flowed towards various areas, other than the drains, to drain naturally. In other words, it followed no definite course, never became part of a directed drainage system, and did not "form part of a natural watercourse or lake." *See Boazova*, 968 N.E.2d at 392. The District Court did not err by ruling that "surface water" may in some ways be "constrained," [A855], which again is perfectly consistent with this Court's decision in *Nova* that water pooling on a parapet roof due to a blocked drainage system was "surface water" under the Policies.

C.   **MPT's Proposed Interpretation Is at Odds with the Plain Language of the Policy**

MPT's final set of arguments attempt to cast aside this Court's binding authority and the SJC's decisions on which it is based to propose an altogether different meaning of the term "surface waters," which it argues is reasonable, and therefore the term is ambiguous, and it therefore must be construed in its favor. MPT Br. at 35-55.  None of these arguments needs to be considered in light of *Nova*, but in any event they fail.

1.   **The Only Relevant Authorities Have All Found the Definition of "Surface Water" Unambiguous**

"Ambiguity does not exist simply because the parties disagree about the proper interpretation of a policy provision[.]"  *Valley Forge Ins. Co. v. Field*, 670 F.3d 93, 97 (1st Cir. 2012) (Massachusetts law).  As the SJC notes, "to ascertain possible relevant meanings, we consider dictionary definitions; we also look to case law to determine whether courts have adopted a consistent interpretation." *Dorchester Mut. Ins. Co. v. Krusell*, 485 Mass. 431, 438, 150 N.E.3d 731, 738-39 (2020).  "*In the absence of case law*, established dictionaries can furnish the approved natural meaning of disputed terms."  *Suffolk Const. Co. v. Illinois Union Ins. Co.*, 80 Mass. App. Ct. 90, 94, 951 N.E.2d 944, 948 (2011) (emphasis added). However, when the controlling authorities here have adopted a consistent interpretation, the Court need look no further.  The Court should reject MPT's

proposed interpretation and its attempts to introduce ambiguity into a term the SJC and this Circuit find unambiguous.

MPT's argument is not reasonable under the language of the Policies, as is clear from *Nova*, *Boazova*, and *Surabian*, each of which holds the undefined term "surface water" is unambiguous, regardless of whether the term is used in a coverage-granting provision or an exclusion. *Nova*, 726 F.3d at 40 (holding damage resulting from "surface water" entering from the roof was covered "under the plain and unambiguous language of the Policy"); *Boazova*, 462 Mass. at 352, 968 N.E.2d at 390-91 (concluding loss caused by "surface waters" "is excluded from coverage by unambiguous provisions in the policy"); *Surabian Realty*, 462 Mass. at 723, 971 N.E.2d at 274 (holding "the plain meaning of the policy, construed as a whole, results in a denial of coverage" under the "surface water" exclusion). Despite the many arguments MPT makes, its proposed interpretation is unreasonable, and no ambiguity exists, because the only relevant authorities in this case have found the term unambiguous and have applied it in the same scenario here.[8] Its plain meaning should control again here.

---

[8] While MPT argues the majority of courts in *other* jurisdictions have rejected Zurich's, and therefore this Circuit's, interpretation of "surface waters," MPT Br. at 41-44, multiple decisions say the opposite. *E.g., Bringhurst*, 124 A. at 797 ("In the case of a building erected on land, the roof is to be regarded as an artificial elevation of the earth's surface. When it intercepts the falling rain or snow, it therefore gathers surface waters."); *Danville Comm'l Indus. Storage, LLC v. Selective Ins. Co.,* 442 F. Supp. 3d 921, 927 (W.D. Va. 2020) ("[T]he majority of

**2.      Dictionary Definitions, Including Those Cited and Interpreted by the SJC, Strongly Favor Zurich's Interpretation that Exterior Artificial Surfaces Can Collect Surface Water Regardless of the Surface's Height**

MPT also invites the Court to consider a number of dictionary definitions, divorced from judicial interpretation, to support its interpretation.  MPT Br. at 44-47; *see* MPT Addendum at 21-32.  In focusing on the phrase "surface of the earth" as articulated in the definitions cited by the SJC, MPT fails to give "surface" its plain meaning.  MPT Br. at 44-45 (repeatedly emphasizing the phrase "surface of the earth").  As the District Court recognized, "surface" generally means "the outer boundary of the earth, in contact with the air," or the "upper boundary or top of solid ground, exposed to air."  [A851 (quoting *Surface*, Oxford English Dictionary,

---

those to have addressed this question have concluded that 'surface water' includes water on a roof."); *Oak Hill Invest. IV LLC,* 2017 WL 4286779, at *3 ("[T]here is a minority of courts who have found water pooling on artificial surfaces, including roofs, is not considered 'surface water.' But, like *Fidelity,* the majority of courts have interpreted surface water to include that which lands on artificial surfaces." (internal citations omitted)); *Martinez v. Am. Family Mut. Ins. Co.,* 413 P.3d 201, 206 (Colo. App. Ct. 2017) ("[O]ur interpretation of the term 'the earth's surface,' accords with the overwhelming majority of jurisdictions that have addressed this issue, which view precipitation collecting on a roof or other man-made structure as 'surface water.'" (internal citations omitted)); *Nathanson v. Wagner*, 179 A. 466, 468 (N.J. Ch. 1935) ("Surface waters are those which fall on the land from the skies or arise in springs, and, following no defined course or channel, are lost by being diffused over the ground through percolation, evaporation, or natural drainage. They embrace waters derived from falling rain and melting snow, whether on the ground or on the roofs of buildings thereon."); *see also Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 2010 WL 1380252, at *2 (Del. Super. Ct. Apr. 8, 2010) ("As a general matter, it would defy common sense to exclude precipitation falling on a roof from a definition of 'surface water.' ").

http://www.oed.com/view/Entry/194886)]; *see also Surface*, Webster's Int'l Dict. (3d ed. 1993) (defining "surface" in part is the "outermost and uppermost boundary"). These definitions are consistent with *Boazova* and *Surabian Realty*, where the SJC concluded that "surface of the earth" included artificial surfaces. *See Boazova*, 462 Mass. at 355, 968 N.E.2d at 393; *Surabian Realty*, 462 Mass. at 718-19, 971 N.E.2d at 272. This Court then applied the definitions in *Boazova* and *Surabian Realty* to conclude that water on other artificial surfaces, such as a roof, also meets the definition of "surface waters," consistent with the dictionary definition of "surface." *Nova,* 726 F.3d at 39-40. It was not error, as MPT argues, for the District Court to consider the plain meaning of "surface" while also considering the SJC's, and this Court's interpretation of the SJC's, definition of "surface waters." [A851-54].

Moreover, this understanding also aligns perfectly with *Boazova*'s citation to the Restatement (Second) of Torts describing "surface water" as "water that occasionally accumulates from natural sources and that has not yet evaporated, percolated into the earth or found its way into a stream or lake." *Boazova*, 462 Mass. at 354, 968 N.E.2d at 392 (quoting Restatement (Second) of Torts § 846, cmt. b). The rain is the natural source, and the water accumulated on the roof because it had not evaporated, percolated into the earth or found its way into a stream, lake, or watercourse. Applying a "height test" cannot be derived from the

43

SJC's definitions, whereas the plain meaning of "surface" as used in the definition naturally encompasses the outermost surface of the earth at any given location (including a parking lot, a patio, or a rooftop).

Thus, though unnecessary to consider given this Circuit's decision in *Nova*, dictionary definitions also support Zurich's position.

### 3. MPT's Remaining Arguments Misunderstand the Flood Coverage's Requirements and Read in Requirements that Are at Odds with the Plain Language

MPT makes a number of final arguments attempting to rebut Zurich's supposed argument that "surface water" means "rainwater accumulating on any surface at all." MPT Br. at 48. This is an exaggeration of Zurich's position, as discussed below, but, regardless, each of MPT's remaining arguments either reads in non-existent requirements into the Flood definition or misunderstands its plainly expressed intent. Once again, they also ignore this Court's decision in *Nova*.

#### a) MPT's Argument that the Pooled Rainwater on the Roof Is "Rain" and Not "Surface Waters" Is Inconsistent with the Plain Meaning of the Policy and the Relevant Case Law

Contrary to *Nova*, MPT effectively claims that the pooled rainwater on the Hospital's roof is "rain," not "surface water," which caused damage to the Hospital's interior by infiltrating the roof. *See, e.g.,* MPT Br. at 45, (citing 11 COUCH ON INSURANCE § 153:50 (3d 2010) for proposition that "rainwater that falls directly onto an insured's building without ever 'flowing on the earth' is

44

considered damage from 'rain,' not 'surface water'"), 51 ("What reached the
hospital roofs and courtyard was rain."), 52 ("Zurich chose to cover damage
caused by rain falling on the building").  MPT argues that if Zurich intended to
limit coverage for "rainwater," if could have easily done so, which it did in a
separate exclusion for damage caused by "rain" in the Policies' coverage for "New
Construction or Additions."  MPT Br. at 51-52.  MPT also argues that the
definition of "Flood" is worded to account for inundation of normally dry land area
or structures as the "effect," which must be "caused" by the "rapid accumulation or
of surface waters," so it follows that the surface waters must come from
somewhere other than the roof itself.  MPT Br. at 50-51.  In the same vein, MPT
argues that Zurich's interpretation would eliminate any meaning of the term
"surface waters," because the Policies could simply refer to the "unusual and rapid
accumulation or runoff of water" generally.  MPT Br. at 54-55.  Each of these
arguments is plainly at odds with the Policies' language and the relevant case law.

To begin, the Policies' distinction between "surface waters" and "rain,"
contrary to MPT's argument, illustrates why the pooled water on the roof was
surface water—not rain.  " 'Rain' is ordinarily and commonly thought of as water
falling from the sky.  After it stops falling, one does not say that it is 'raining'
although there may still be wet sidewalks and streets, puddles of water resulting
from the rain, or water running through gutters and elsewhere as a result of the

rain." *State Farm Fire & Cas. Co. v. Paulson*, 756 P.2d 764, 767 (Wyo. 1988).[9]

But the water here accumulated on the roof and in the courtyard before infiltrating

the roof system and seeping through the Hospital.  This cannot be rain: "If, by

definition, 'rain' remains 'rain' after it stops falling, then the water in streams and

lakes, coming from household faucets, etc. is 'rain' since it originated, partly at

least, from water that fell from the sky."  *Id*. (recognizing distinction between

"rain" and "surface water" and refusing to interpret them synonymously).  The two

terms are not synonymous, and by distinguishing between the two, the Policies

clearly intended to treat them differently.  MPT would have rain on a patio be

surface water, but the same accumulation of rain on a roof simply be rain.  Though

MPT would argue a patio is at "ground level," this distinction ignores the reality of

the common understanding of "rain" and "surface water" in favor of a hyper-

technical understanding that is at odds with how the two naturally occur.[10]  In any

---

[9] Light puddles of pooled rainwater on a sidewalk (or roof) would still be "surface waters" but are not a "Flood" if there is no inundation.

[10] MPT briefly asserts that each of the types of water in the Flood definition "describe water that exists at ground or sea-level before it inundates a normally dry land area or structure."  MPT Br. at 49.  MPT again reads in a characteristic not found in the Policies.  It is sufficient that the type of water fits within one of the term's ordinary meanings and are capable of inundating the land *or a structure*. Indeed, MPT's argument that the ruling would render "surface waters" the only "top-down" source of flooding in the definition and is somehow inconsistent with the position Zurich has taken in an online consumer guide for homeowners regarding the backup of sewers and drains can be ignored completely.  The document MTP references, to begin, is clear that "top down" damage "*may be*

event, this argument also is at odds with this Circuit's decision in *Nova*, which explicitly rejected the argument that the accumulated water on the roof that entered through the roof's skylights was "rain." *Nova*, 726 F.3d at 37-38. The pooled water here was not "rain" either.

MPT also argues the "cause and effect" structure of the Flood definition suggests the roof water cannot be both the inundation and the accumulation of "surface waters," and the "surface waters" must therefore come from somewhere else. MPT Br. at 50-51. The inundation of the roof is the effect. The cause of this inundation is the heavy rainfall event resulting in rapid accumulation of surface waters. The fact that the water is described as "surface water" does not render the roof itself the cause of the accumulation; rather, the word "surface" is modifying, or otherwise describing, the type of water at issue. The rainwater pooled on the outermost surface, becoming surface water, that then inundated the roof once sufficient water had accumulated. This is perfectly consistent with the Policies'

---

covered," such as ice dams on a roof—not that they "are covered" or that ice dams cannot also create surface waters. MTP Br. at 51 n.13 (citing https://www.zurichna.com/media/project/zwp/zna/docs/kh/prog/water_damage.pdf) (emphasis added). While referring to surface waters as a potential source of overflow for a drain or sump pump, in the context of the article to assist homeowners (though the Hospital's roofs also contain drain systems), the guide also notes that " 'Surface water' is defined as water that collects from rainwater in an area that would normally not be covered in water" and "may or may not be covered by a policy or endorsement." There is nothing inconsistent with Zurich's position here.

language.  Moreover, the surface water *did* travel from the exterior of the building into the interior.  MPT's argument that the surface waters must come from someplace else is meritless.[11]

MPT similarly argues that, because any accumulation of water must be on a surface, Zurich's interpretation would eliminate any meaning of the term "surface waters," because the Policies could simply refer to the "unusual and rapid accumulation or runoff of water" generally to have the same effect.  MPT Br. at 54-55.  But by using "surface water," rather than simply "water," the Policies clarify that the accumulated water must come from a natural source (e.g., rain or melting snow) and that it must accumulate on the outermost surface of the earth (e.g., a patio or roof).  Water from a cracked rooftop water tower or rain that travels directly through a window to inundate a kitchen potentially could be considered an "unusual and rapid accumulation or runoff of water" that could inundate dry land or structures, but they would still not be "surface water."  Again, the Policies' language is clear as to what is required for a "Flood" to occur, and when it is caused by surface waters, this Court may apply its ordinary meaning under *Nova*.

---

[11] Practically, it makes no difference where on the exterior of a property the surface waters accumulate—if the patio itself in *Boazova* had also been overwhelmed and damaged by the seeping surface water, that would not have changed its status as surface water.

**b)** ***The District Court Correctly Looked to the Definition of "Mudslide" to Support Its Interpretation of "Surface Waters"***

The District Court also correctly looked to the surrounding definition of "Flood" to determine that "surface waters" need not be at "ground-level." As the District Court noted, "Flood" is also defined as "mudflow or mudslides caused by accumulation of water on or under the ground." [A852, A634]. Given that the Policies' language identifies water accumulating on or under the ground when that is at issue, the absence of that language with regard to "surface water" means that "surface water" includes surfaces "other than just the ground." *See, e.g., Danville Commercial*, 442 F. Supp. 3d at 927 (declining to limit the definition of "surface water" to water on the ground because "this would make the term 'ground' superfluous").

MPT's attempts to explain away the Policies' usage of the phrase water "on the ground" are not convincing. First, MPT argues that "surface waters *on the ground*" would be redundant after reading in the SJC's definition of "surface waters." This argument is inconsistent with its interpretation that "surface water" requires the accumulated water be at "ground level," suggesting "ground" means the *natural* earth. MPT simply adds the word "level" for its interpretation, which is not found in the provision or the SJC's definitions, which plainly include artificial surfaces as well.

49

MPT finally argues that including "on the ground" serves a distinct purpose when used with "mudflow or mudslides," because it clarifies that not any condition of inundation caused by mudflow or mudslides will qualify as "Flood," which necessarily involve the movement of wet soil that can only exist on the natural "ground." MPT Br. at 53-54. MPT helps prove the District Court's point—though mudslides can only exist on the natural ground, the Policies nonetheless describe the location of the water to rule out potential alternatives. "Surface water," on the other hand, makes no reference to the location (or height) of the water, and should not be read to do so, especially in light of the SJC's and this Circuit's precedent.

> c)    *MPT's Argument that Construing Accumulation of Water on a Roof as "Surface Waters" Would Impact the Availability and Pricing of Flood Insurance Is Conjecture*

MPT's final substantive argument that insurers do not consider the physical characteristics of a building's roof when pricing flood coverage, and thus a ruling against it here would profoundly impact the flood insurance marketplace, is simply conjecture. MPT Br. at 56-57. First, this Circuit already held, ten years ago, that "surface waters" can gather on roofs. Following that ruling here (in line with many other jurisdictions) will not have the impact MPT suggests. The Court need not consider MPT's speculative argument, and it should interpret the Policies just as it has before.

50

**D.     The Court Should Not Certify Questions to the SJC**

This Court may certify questions to the SJC when this Court "find[s] no controlling precedent, where the answer is unclear, and where the answer will be determinative of an issue in the litigation."  *Foxworth v. St. Amand*, 570 F.3d 414, 437 (1st Cir. 2009).  Here, there is controlling precedent and the answer is clear, and the Court should not certify questions to the SJC.

## VI.     CONCLUSION

For the reasons set forth above, Appellees respectfully request the Court affirm the District Court's orders (1) in the *MPT* case, granting Zurich's motion for partial summary judgment and denying MPT's cross-motion and (2) in the *Steward* case, denying Steward's motion for partial summary judgment and granting AGLIC's and Zurich's cross-motion.

Dated: August 7, 2023                    Respectfully submitted,

                                                */s/ Patrick F. Hofer*
                                                Patrick F. Hofer (# 1199731)
                                                Clyde & Co US LLP
                                                1775 Pennsylvania Avenue, N.W., Suite 400
                                                Washington, D.C. 20006
                                                Tel: (202) 747-5110
                                                patrick.hofer@clydeco.us

                                                *Attorney for Appellees Zurich American*
                                                *Insurance Company and American*
                                                *Guarantee and Liability Insurance Company*

<u>**CERTIFICATE OF COMPLIANCE**</u>

Pursuant to Fed. R. App. P. 32(g), I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B).  Counting all words but excluding the parts of this brief exempted by Fed. R. App. P. 32(f), this brief contains 12,909 words.

I further certify that this brief complies with the typeface requirements of Fed R. App. P. 32(a)(5)-(6), because this document has been prepared in a proportionally spaced 14-point Times New Roman font.

*/s/ Patrick F. Hofer*
Patrick F. Hofer (# 1199731)

<u>**CERTIFICATE OF SERVICE**</u>

I, Patrick F. Hofer, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants by mail and/or email on August 7, 2023, at the addresses listed below.

> David D. Disiere
> Martin, Disiere, Jefferson & Wisdom
> 808 Travis, Suite 1100
> Houston, TX 77002
> disiere@mdjwlaw.com

> */s/ Patrick F. Hofer*
> Patrick F. Hofer (# 1199731)